**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KEVONNA BUCHANAN,<br><br>                                  Plaintiff,<br><br>           -against-<br><br>THE CITY OF ROCHESTER, HENRY FAVOR, NASER ZENELOVIC, RAYMOND DEARCOP, RALPH MONTINARELLI, JOSEPH MORABITO, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), COUNTY OF MONROE, TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,<br><br>                                  Defendants. | CASE NO: 23-CV-6292<br><br>**COMPLAINT**<br>**[JURY TRIAL DEMANDED]** |

Plaintiff, by her attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I.      **PARTIES**

1.    Plaintiff KEVONNA BUCHANAN (she/her) is a resident of the City of Rochester, State of New York.

2.    Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

3.    Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant CITY maintains the City of Rochester Police Department ("RPD"), a duly authorized police department,

authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.      Defendant HENRY FAVOR is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Favor is sued in his individual capacity. Favor was one of the Incident Commanders on September 4, 2020.

5.      Defendant NASER ZENELOVIC is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Zenelovic is sued in his individual capacity. Zenelovic was one of the Incident Commanders on September 4, 2020.

6.      Defendant RAYMOND DEARCOP is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Dearcop is sued in his individual capacity. Dearcop was one of the Incident Commanders on September 4, 2020.

7.      Defendant RALPH MONTINARELLI is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Montinarelli is sued in his individual capacity. Montinarelli was one of the Incident Commanders on September 4, 2020.

8.      Defendant JOSEPH MORABITO is or was at all relevant times a supervisory employee of RPD and acting within the scope of his employment and under color of law. Defendant Morabito is sued in his individual capacity. Morabito was the Incident Commander on September 5, 2020.

9.      "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police

Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

10.     Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant COUNTY maintains the Monroe County Sheriff's Office ("MCSO") and pays the salaries of the Monroe County Sheriff and MCSO deputies. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of the MCSO as the COUNTY's police department.

11.     Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

12.     "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

13.     BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

## II.  JURISDICTION AND CONDITIONS PRECEDENT

14.     This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over

claims arising out of violations of the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

15.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York, the

judicial district where the claims arose and in which the Defendants conduct business.

## III.  STATEMENT OF FACTS

**A.     Facts Common to All Causes of Action.**

4.        On May 25, 2020, Minneapolis police officer Derek Chauvin murdered George Floyd,

who was handcuffed and lying face down on the ground, by suffocating him to death in broad

daylight on the street.

5.        Floyd's murder and the police murder of Breonna Taylor in Louisville, Kentucky, in

addition to recent police murders of other Black people in the United States sparked the largest

movement for social and racial justice in history and has included peaceful protests around the

world against anti-Black police violence, systemic racism, and inequality.

6.        In Rochester, as detailed below, plaintiff attended a protest in front of the Public Safety

building on May 30, 2021, where she was attacked by Rochester Police Department Officers and

Sheriff's Deputies, who pushed and hit her with batons, shot her with pepper balls, and tear gassed

and pepper sprayed her. As a result of being attacked with chemical weapons on May 30, 2020,

Ms. Buchanan suffered severe menstrual irregularities, including menstruating for two months

straight.

7.        Months before George Floyd's murder, on March 23, 2020, Daniel Prude's family

sought help from the RPD as Daniel was suffering an acute mental health crisis. Tragically, that

call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as

an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

8.          When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

9.          Protesters gathered outside the PSB and in downtown Rochester, chanted, and held signs. Some of the protesters' chants and signs were specific to Daniel Prude; others decried the pattern of racialized, violent policing in Rochester, of which Mr. Prude's killing was the latest, most egregious example.

10.          The largest of these protests took place between September 2 and September 6, 2020. The RPD and MCSO responded to these protests with extreme and unnecessary force—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

11.          Although termed "nonlethal" or "less-than-lethal" force, military-grade crowd control devices like those used by the RPD and Sheriff's Deputies involve serious risks of injury, and even death. Chemical irritants ("CIs"), like tear gas and pepper spray, are banned in warfare because they are indiscriminate weapons by design, especially when deployed by firing a grenade or canister. CIs can cause severe injury or death, and, even at low concentrations, exposure to tear gas presents a risk of serious, irreversible health effects.

12.          Over the course of three nights, from September 3 to September 5, 2020, RPD officers fired tear gas canisters 77 times into groups of protesters expressly gathered to support Black lives,

at journalists and legal observers attempting to report on and record the abuse, and at medics there to provide care and safety to the protesters—often when people had no escape route to get away from the chemical clouds. The tear gas canisters are themselves projectile weapons; direct impact can cause significant blunt trauma, including bone fractures, lacerations and internal bleeding, and death.

13.     Over those three nights, RPD officers also discharged 6,100 pepper balls at people who had gathered to protest the Department's aggressive and racist policing. In fact, one RPD officer on the night of September 4, 2020, fired 148 pepper balls in the span of just twenty minutes, at a group of people who were penned in or "kettled" by police on the Court Street Bridge in downtown Rochester.

14.     RPD officers also shot protesters with 40mm direct-impact foam bullets—known as kinetic impact projectiles ("KIPS")—which can cause a range of injuries including death. KIPs are inherently inaccurate when fired from afar and so they often injure bystanders and strike vulnerable body parts of intended targets and bystanders. RPD officers fired Def Tec and CTS 40 mm munitions during the protests. The CTS website cautions that shots to the head, neck, thorax, heart, or spine can result in fatal or serious injury. Use of force reports by RPD officers detail deploying 40mm munitions at individuals' abdomens at the September 5 demonstration.

15.     Other indiscriminate, military-grade weapons employed by the RPD and Sheriff's Deputies and law enforcement included flash bang grenades and a Long Range Acoustic Device ("LRAD"), which is both a sound system and a sonic weapon that can cause permanent hearing damage.

16.      Sheriff's Deputies also deployed "less lethal" and/or military-grade weapons against peaceful protesters, including shooting pepper balls and other chemical weapons; they also pushed protesters and struck them with batons.

17.      On information and belief, BAXTER did not provide any training to the Sheriff's Deputies on how to safely use these "less lethal" and/or military-grade weapons against peaceful protesters; and or the training provided was inadequate.

18.      As part of the City and RPD's coordinated strategy, the CITY and the RPD asked the COUNTY and BAXTER, to send the Defendant Sheriff's Deputies to Rochester to police the protests.

19.      The CITY and the RPD requested that BAXTER send Sheriff's Deputies to create an intimidating law enforcement response that was militarized.

20.      Along with the RPD, BAXTER sent Sheriff's Deputies and contributed personnel and resources to create a massive police presence to confront those assembled in peaceful protest to call the RPD to account for its widespread use of violence against people of color.

21.      The multi-agency response was managed under a unified command system between the CITY and the RPD; the MCSO and BAXTER; and the State Police.

22.      Upon information and belief, former RPD Chief La'Ron Singletary oversaw the unified command system for the CITY and RPD.

23.      Upon information and belief, Defendant BAXTER oversaw the unified command system for the County and MCSO.

24.      Upon information and belief, on the nights of the protests detailed herein, Singletary was present in the RPD's Command Post and was overseeing and directing RPD officers and other

law enforcement officers' response to the protesters, including the use of specific tactics and weapons.

25.     Upon information and belief, on the nights of the protests detailed herein, Defendants BAXTER and other commanding officers of the MCSO and County were present in the MCSO Command Post and were overseeing and directing Sheriff's Deputies' response to the protesters and coordinating with Singletary and other RPD officials about the response to protesters, including the use of specific tactics and weapons.

26.     Peaceful protests continued in the months after these initial nights.

27.     As a result of the violent response of the RPD officers and Deputy Sheriffs, under the direction and control of the CITY, COUNTY and BAXTER, the Plaintiffs were injured and harmed, and their rights to free expression under the State and Federal Constitutions were suppressed.

**a.     <u>May 30, 2020 Protest</u>**

28.     On May 30, 2020, plaintiff KEVONNA BUCHANAN attended a peaceful protest in front of the Public Safety Building ("PSB") in downtown Rochester.

29.     Before plaintiff arrived at the protest on May 30, 2020, law enforcement had closed Exchange Boulevard in the vicinity of the PSB to vehicular traffic.

30.     In response to the peaceful protest, Defendants and their employees and agents subjected plaintiff and others to grossly excessive and disproportionate force.

31.     As a peaceful demonstration took place, RPD officers and Sheriff's Deputies pepper sprayed protesters, indiscriminately shot pepper balls into the crowd, physically pushed protesters and struck them with batons.

32.     On May 30, 2020, at approximately 5:00 p.m., Ms. BUCHANAN was standing directly in front of the PSB, on the sidewalk, while holding hands with other protesters, peacefully protesting, when officers threw a tear gas cannister at her and other peaceful protesters, without cause or justification.

33.     When Ms. BUCHANAN turned and retreated, RPD Officers and/or Sheriff's Deputies shot her in the back and the legs numerous times with pepper balls.

34.     Pursuant to policy, Defendants used types of force, such as by deploying pepper spray and indiscriminately shooting pepper balls into the crowd, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances

35.     As a result of the violent response of the RPD and MCSO on May 30, 2020, plaintiff was injured and harmed, and her rights under the common law and under the State and Federal Constitutions were suppressed and violated.

36.     As a result of the chemical weapons Defendants used against her on May 30, 2020, Ms. BUCHANAN sustained menstrual irregularities—including menstruating for two months straight.

**b.     September 4, 2020 Protest**

37.     On September 4, RPD officers and Sheriff's Deputies used the Court Street bridge to "kettle" protesters, spray them with tear gas, and attack them with pepper balls—a scene tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the Edmund Pettus Bridge in Selma, Alabama.

38.     Videos from that night show heavily armored phalanxes of police using pepper balls, 40mm kinetic bullets, tear gas, and batons to assault diverse groups of protesters outfitted only

with umbrellas, cardboard boxes, and plastic children's sleds against the Defendants' military-grade arsenal but who nevertheless assembled to protest for racial justice and reformed policing.

39.        After protesters had marched onto the bridge and had nowhere to go, the police ordered the protesters to "disperse." But when they were unable to immediately comply, suddenly, without giving the protesters the time or opportunity to disperse—*and knowing it was physically impossible for them to comply with the dispersal orders*—law enforcement officers began violently attacking protesters.

40.        First, upon information and belief, defendants FAVOR, ZENELOVIC, DEARCOP, MONTINARELLI ordered RPD officers to deploy pepper balls at the crowd.

41.        On September 4, 2020, between approximately 10:43 p.m. and 11:00 p.m., while present on the Court Street Bridge, RPD officers and/or Sheriff's Deputies shot Ms. BUCHANAN numerous times with pepper balls in the body, legs and back, and subjected her to large amounts of tear gas and other chemical weapons.

42.        Pursuant to policy, Defendants used types of force, such as by deploying pepper spray and indiscriminately shooting pepper balls into the crowd, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

43.        At no time did Ms. BUCHANAN commit any crime or violation, nor did the RPD officers and/or Sheriff's Deputies have cause or justification to use any force against her.

44.        As a result of the chemical weapons Defendants used against her, Ms. BUCHANAN sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

**c.        September 5, 2020 Protest**

45.        On the night of Saturday September 5, 2020, RPD officers and Sheriff's deputies again used military grade weapons to attack peaceful protesters in downtown Rochester. RPD officers and Sheriff's deputies trapped peaceful protesters at the intersection of Broad Street and Exchange Boulevard, and almost immediately began attacking them. RPD officers and Sheriff's deputies began to launch flash bang grenades, release tear gas, and shoot pepper balls into the crowd indiscriminately.

46.        As videos of the law enforcement response on that night demonstrate, the John Doe RPD officers and Richard Roe Sheriff's Deputies, along with other law enforcement officers, unleashed a torrent of violence on the peaceful protesters—causing many protesters serious injury. One such video, incorporated herein, can be seen here: https://tinyurl.com/vra3x4j7.

47.        On September 5, 2020, between approximately 10:30 p.m. – 11:30 p.m., in the vicinity of Broad Street and Exchange Blvd., RPD officers and/or Sheriff's Deputies subjected Ms. BUCHANAN to a large amount of tear gas and other chemical weapons, which were incapacitating, and flash bang grenades and the LRAD.

48.        Upon information and belief, defendant MORABITO authorized and directed the use of tear gas and other chemical weapons that plaintiff was attacked with.

49.        Pursuant to policy, Defendants used types of force, such as by deploying pepper spray and indiscriminately shooting pepper balls into the crowd, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

50.        At no time did Ms. BUCHANAN commit any crime or violation, nor did the RPD officers and/or Sheriff's Deputies have cause or justification to use any force against her.

51.    As a result of the chemical weapons Defendants used against her, Ms. BUCHANAN sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

B.    **Unlawful Municipal Policies and Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters**.

52.    For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released.

53.    From the very beginning, the City and RPD officials zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism. City and RPD officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

54.    This manifested in the training of their officers, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

55.    During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

56.     The violations of plaintiff rights are attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar peaceful protests and peaceful demonstrations.

57.     Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests and lawful demonstrations.

58.     Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

59.     According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

60.     The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and at the protests on May 30, 2020, September 4-5, 2020, and September 5-6, 2920 specifically.

61.     Between March and September 2020, the MFF and the Grenadiers had at least five trainings. Upon information and belief, these trainings were held specifically in preparation for anticipated protests when the video of RPD officers using force against Daniel Prude, causing his death, was publicly released.

62.     According to the After Action Reports, "[t]he entire idea behind a MFF operation is to disperse." Thus, RPD has admitted that the goal of the MFF operations at the protests at issue was disperse the crowds, and not to respect the First Amendment Rights of protesters.

63.     Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

64.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of plaintiff.

65.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

66.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

67.     For example, upon information and belief, there is virtually no RPD training—and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

68.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

69.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground….They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

70.      Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

71.      In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

72.      When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

73.      The City and RPD's failure to train and improper training led to widespread excessive force at the 2020 protests, as demonstrated by RPD officers body worn camera videos, media reports, and RPD subject resistance reports.  However, Based on statements by City Officials and RPD command staff to date, and publicly available information, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2–6, 2020.

74.      In official After Action reports, RPD officials ratified the unlawful tactics and widespread use of excessive force against protesters on September 3, 4 and 5.

75.      The City and RPD did not simply ratify excessive force through the lack of reporting and discipline. It approved the force during the demonstrations because its policies authorized these excessive levels of force. RPD training on grenadier, MFF, and crowd control tactics, as well as its subject resistance reports, show that tear gas, pepper spray, projectiles, and grenades were supplied by superiors and deployed on their orders pursuant to RPD policies on use for force. There appears to have been no consideration given to whether such force would be excessive to

secure compliance with traffic laws or enforce violations or misdemeanors against nonviolent protestors.

76.     In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein.

**C.     Unlawful Municipal Policies and Negligence of the COUNTY and Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

77.     Upon information and belief, for months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the COUNTY and BAXTER coordinated with the CITY and RPD to prepare for and plan their coordinated response to the anticipated large-scale protests when the video was eventually released.

78.     From the very beginning, the BAXTER and other COUNTY officials zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism. Like the City and RPD officials, BAXTER and other COUNTY officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

79.     This manifested in the training of their Sheriff's Deputies, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their Sheriff's Deputies was clear: there is no such thing as a peaceful protestor.

80.     Upon information and belief, during those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD coordinated with the COUNTY and BAXTER to develop a coordinated protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing

81.     Prior to September 2020, the COUNTY and BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

82.     The COUNTY and BAXTER deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

83.     The COUNTY and BAXTER, upon information and belief, took no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

84.    Instead, the COUNTY and BAXTER, pursuant to the County's Hazard Mitigation Plan, trained Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

85.    Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

86.    Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY and BAXTER had implemented the Hazard Mitigation Plan, and trained Sheriff's Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

87.    Upon information and belief, the COUNTY and BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

88.    According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of the COUNTY and BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

89.    Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful

demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

90.     Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

91.     Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, the COUNTY and BAXTER train Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

92.     Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

93.     In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

94.     BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

95.      As a result of the COUNTY's unlawful policies, practices and customs, and BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF: Municipal Liability

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights*
**(Against the CITY)**

96.      All preceding and subsequent paragraphs are incorporated by reference.

97.      All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

98.      As a result of the foregoing, Plaintiff suffered injuries and damages.

### SECOND CLAIM FOR RELIEF

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests*
**(Against the COUNTY and BAXTER)**

99.      All preceding and subsequent paragraphs are incorporated by reference.

100.     All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed MCSO employees and/or Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY and MCSO, including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER, and other policymaking officials; (d) Defendant COUNTY, MCSO and BAXTER's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by their failures, and the failures of the other policymaking agents, to train, supervise, and discipline MCSO employees and/or Sheriff's Deputies, despite full knowledge of their wrongful acts Plaintiffs and other protesters, as described herein.

101.     As a result of the foregoing, Plaintiff suffered injuries and damages.

### THIRD CLAIM FOR RELIEF
**Excessive Force**
***Pursuant to 42 U.S.C. § 1983***

102.     All preceding and subsequent paragraphs are incorporated by reference.

103.     Defendants' actions towards Plaintiff constitutes excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

104.     Defendants used force against Ms. LYNCH that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

105.     It was objectively unreasonable for officers to shoot Plaintiff with pepper balls, attack her with tear gas, to use military grade weapons, "less-than-lethal" weapons, and chemical

weapons against her on May 30, 2020 and September 4 and September 5-6, 2020, without first having made an individualized determination that it was reasonable to use any force against plaintiff based on her own individual conduct, instead of any perceived "group conduct."

106.     The force used against plaintiff constitutes a seizure under the 4th Amendment.

107.     The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, related RPD policies and/or training, and MCSO and/or Baxter's policies and training.

108.     As a result of the acts and omissions of the RPD officers and sheriff's deputies, Defendants deprived Plaintiff of federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

109.     The actions of the RPD officers were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

110.     As a result of the foregoing, Plaintiff suffered injuries and damages.

### FOURTH CLAIM FOR RELIEF
**First Amendment Infringements, Including First Amendment Retaliation**
***Pursuant to 42 U.S.C. § 1983***

111.     All preceding and subsequent paragraphs are incorporated by reference.

112.     In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

113.     Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to subjecting

Plaintiff to excessive force, in arresting and prosecuting plaintiff, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

114.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's perceived protected speech and/or conduct.

115.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

116.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

117.    Plaintiff's First Amendment Rights were violated, and her speech was curbed and hindered, as a result of being assaulted, battered, subjected to excessive force and falsely arrested by Defendants.

118.    Defendants' unlawful actions towards plaintiff were motivated by the message she was expressing: calling for greater police accountability, a reallocation of funding from away from police departments and into Black and Latinx communities, the end of police brutality, and a recognition that Black Lives Matter.

119.    Defendants' actions effectively chilled and deterred plaintiff from exercising her First Amendment Rights, as she was prevented from further protesting on May 30, 2020, September 4-5, 2020 and 5-6, 2020.

120.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

121.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**FIFTH CLAIM FOR RELIEF**
**Failure To Intervene**
*Pursuant to 42 U.S.C. § 1983*

122.     All preceding and subsequent paragraphs are incorporated by reference.

123.     The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf

to prevent the violation of his constitutional rights by the other Defendant RPD officers and

Sheriff's Deputies.

124.     The individual defendants failed to intervene on Plaintiff's behalf despite having had

realistic opportunities to do so.

125.     The individual defendants failed to intervene on Plaintiff's behalf despite having

substantially contributed to the circumstances within which Plaintiff's rights were violated by their

affirmative conduct.

126.     As a result of the aforementioned conduct of the individual defendants, Plaintiff's

constitutional rights were violated.

127.     Defendant' actions were willful, malicious, oppressive, and/or reckless, and was of

such a nature that punitive damages should be imposed.

128.     As a result of the foregoing, Plaintiff suffered injuries and damages.

**SIXTH CLAIM FOR RELIEF**
**Supervisory Liability under 42 U.S.C. § 1983**
**(Against FAVOR, ZENELOVIC, DEARCOP, MONTINARELLI, MORABITO)**

129.     All preceding and subsequent paragraphs are incorporated by reference.

130.     In the manner described above, Defendants FAVOR, ZENELOVIC, DEARCOP,

MONTINARELLI, and MORABITO were personally involved in or personally directed, controlled, or

authorized the actions of their subordinate officers which violated Plaintiff Packard's constitutional rights

described in Claims 3 and 4. Defendant FAVOR, ZENELOVIC, DEARCOP, MONTINARELLI, and

MORABITO's actions, direction, and control caused Plaintiff's constitutional violations complained of in Claims 3 and 4; they set in motion a series of events that they knew or reasonably should have known would cause others to deprive Plaintiff of her constitutional rights. Defendants FAVOR, ZENELOVIC, DEARCOP, MONTINARELLI, and MORABITO knew of and acquiesced in the constitutional violations committed by their subordinates. In so doing, these Defendants disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to Plaintiff's rights.

131.    As a result of the foregoing, plaintiff was injured and harmed.

## SEVENTH CLAIM FOR RELIEF
### Supervisory Liability under 42 U.S.C. § 1983
### (Against BAXTER)

132.    All preceding and subsequent paragraphs are incorporated by reference.

133.    BAXTER personally caused plaintiff's constitutional injuries by being deliberately or consciously indifferent to the rights of protesters in failing to properly supervise, train, and discipline his subordinate employees.

134.    BAXTER personally caused plaintiff's constitutional injuries by ratifying the unlawful actions of his subordinate employees, which encouraged them to similarly violate the rights of protesters at subsequent protests as he had approved of their unlawful actions.

135.    BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training on how to safely police large scale protests.

136.    Alternatively, the training BAXTER provided to the Sheriff's Deputies was inadequate.

137.    BAXTER's negligence in failing to supervise and discipline his Sheriff's Deputies was the direct and proximate cause of plaintiff's injuries.

138.    As a result of the foregoing, plaintiff was injured and harmed.

WHEREFORE and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.      Empanel a jury;

b.      Award compensatory and punitive damages;

c.      The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City;

d.      Award punitive damages to plaintiff based on the actions of FAVOR, ZENELOVIC, DEARCOP, MONTINARELLI, MORABITO and BAXTER.

e.      Award Plaintiff reasonable attorney's fees and costs, and interest pursuant to 42 U.S.C. § 1988; and

f.      Such other and further relief as the court may deem just and proper.

Dated: New York, New York
         May 26, 2023

Respectfully Submitted,

ROTH & ROTH, LLP.

~//S//~

_____
Elliot Dolby Shields
Co-counsel for Plaintiffs
192 Lexington Avenue, Suite 802
New York, New York 10024
(212) 425-1020

Donald Thompson
Co-counsel for Plaintiffs
16 West Main Street, Suite 243
Rochester, New York 14614
Ph: (585) 423-8290